**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**October 17, 2024**

# In the Court of Appeals of Georgia

A24A0909, A24A0910. HEALTH SERVICES OF CENTRAL GEORGIA, INC. et al. v. WANNA; and vice versa.

GOBEIL, Judge.

This is the second appearance of this matter before this Court, which concerns a dispute between the parties over Fady S. Wanna, M.D.'s contracts governing his employment with Health Services of Central Georgia, Inc. ("Health Services") and Navicent Health, f/k/a Central Georgia Health Systems, Inc. ("Navicent") (and collectively, the "Defendants") and the sale of his medical practice. We previously decided companion appeals related to two summary judgment orders addressing the parties' claims and counterclaims, as well as a discovery order entered by the trial court. See *Wanna v. Navicent Health, Inc.*, 357 Ga. App. 140 (850 SE2d 191) (2020)

("*Wanna I*"). Upon remand, the parties' remaining claims and counterclaims were tried in a multi-week jury trial, and the parties have now both appealed to this Court.

In Case No. A24A0909, the Defendants argue that the trial court erred in (1) accepting an inconsistent verdict in favor of Dr. Wanna; (2) admitting into evidence irrelevant and unfairly prejudicial e-mails; (3) denying the Defendants' motion for a directed verdict on Wanna's fraud and negligent misrepresentation claims as the evidence was insufficient to sustain the jury's verdict on these claims; and (4) denying the Defendants' motion for a directed verdict on Wanna's claim for OCGA § 13-6-11 attorney fees and expenses.

In his cross-appeal in Case No. A24A0910, Dr. Wanna contends that the trial court erred by (1) overruling his objections to the admission of certain defense exhibits; (2) denying his motion for a directed verdict on the Defendants' claim for lost profits; (3) sustaining the Defendants' objection to his questioning of Navicent's Chief Financial Officer ("CFO") about the company's 2023 financial information; (4) granting the Defendants' motion in limine regarding statements allegedly made by Navicent's Chief Executive Officer ("CEO") to Wanna at an executive training

session; and (5) granting the Defendants' motion for a protective order and awarding the Defendants attorney fees.

For the reasons that follow, we affirm in part and reverse in part in Case No. A24A0909, and remand to the trial court for an evidentiary hearing to allow Dr. Wanna to establish the amount of OCGA § 13-6-11 attorney fees that was attributable to his prevailing claims with respect to each attorney. We affirm in Case No. A24A0910.

*Legal Standard*

"(T)his Court reviews the judgment entered by the trial court after approval of a jury verdict upon the any evidence test, absent any material error of law. Additionally, when a question of law is at issue, we owe no deference to the trial court's ruling and apply a de novo standard of review." *Howland v. Wadsworth*, 324 Ga. App. 175, 176-177 (749 SE2d 762) (2013) (citations and punctuation omitted).

*Background Facts and Procedural History*

The extensive factual background to the underlying dispute between the parties is recounted in *Wanna I*, 357 Ga. App. at 141-146. Here, we set forth only those facts necessary to place the parties' current appeals into context.

Navicent is the corporate parent of the Medical Center of Central Georgia, a hospital located in Macon ("Medical Center"), and Health Services, a physician group. *Wanna I*, 357 Ga. App. at 141. Dr. Wanna is a surgeon who is licensed to practice medicine in the State of Georgia and is board-certified by the American Board of Thoracic Surgery with a specialty in cardiothoracic and vascular surgery. Effective July 1, 2013, Dr. Wanna and Navicent entered into an employment agreement under which Wanna agreed to serve as the Chief Medical Officer and Chief Clinical Officer of Navicent in exchange for certain compensation and benefits ("Executive Agreement"). Pursuant to the Executive Agreement, which had an initial term of three years, Navicent agreed to pay Wanna a base salary and certain benefits, including, as relevant here, severance compensation if he resigned his executive position for "Good Reason at any time" after providing Navicent notice and an opportunity to cure. Pursuant to Section 4 (b) (1) (i) of the Executive Agreement, "Good Reason" was defined to include a material reduction in Wanna's base salary. Under the Executive Agreement, Wanna also was eligible under certain circumstances for annual incentive compensation under Navicent's Management Incentive Plan

("MIP") and retirement benefits under its Supplemental Executive Retirement Plan ("SERP"). As this Court explained in *Wanna I*:

> Two documents are at issue pertaining to the SERP plan: (1) a "Summary of Navicent Health Executive SERP" provided to Dr. Wanna while he served as an executive (the "SERP Summary"), and (2) the SERP plan document (the "SERP Plan"). The SERP Summary stated that an executive's account vested upon, among other things, "the termination by the Executive of his or her employment for good reason (e.g., a material reduction in the Executive's base salary, authority, duties, etc.)." In contrast, the SERP Plan did not provide for vesting upon the termination of an executive for good reason. Rather, the SERP Plan required continuous employment for five years before an executive had any vested right to SERP contributions, subject to an exception for accelerated vesting based on a "separation of service" due to death, disability, or "involuntary separation of service . . . without Cause" initiated by Navicent.

357 Ga. App. at 155 (4). The Executive Agreement also contained restrictive covenants, including non-compete and non-solicitation provisions that applied to Wanna during his employment and for a designated time period thereafter.

While serving in his executive position at Navicent, Dr. Wanna continued to maintain his cardiac surgery practice, including performing cardiothoracic and vascular surgeries at Coliseum Medical Center, another hospital located in Macon.

*Wanna I*, 357 Ga. App. at 142. In 2014, Wanna entered into a physician employment agreement with Health Services that set out the terms of his continued work as a surgeon ("Physician Agreement"). Pursuant to the terms of the Physician Agreement, Wanna agreed to work as a part-time physician and cardiothoracic surgeon with Health Services and remain a member of the active clinical staff at the Medical Center while continuing to work as an executive at Navicent. Health Services agreed to pay Wanna a base salary as well as productivity compensation. The initial term of the Physician Agreement was three years, but Wanna retained the ability to terminate the Physician Agreement "at any time upon the occurrence of a material breach of the terms of [the] Agreement by [Health Services]" so long as the latter was afforded notice and an opportunity to cure within 30 days of notice of such breach. The Physician Agreement also contained a non-compete covenant. Finally, as relevant here, effective March 2015, Wanna and Health Services executed an agreement under which Health Services agreed to purchase the assets of the professional corporation owned by Wanna and his partners (the "Asset Purchase Agreement"). The Asset Purchase Agreement also contained non-compete and non-solicitation covenants applicable to Wanna.

On September 1, 2015, Dr. Wanna sent a letter to Navicent's President and CEO, Ninfa Saunders, asserting that he was "resigning for good reason pursuant to [Section 4 (b) (1) (i)] of [the Executive] Agreement as there ha[d] been a material reduction in his base salary[.]" According to Wanna, Navicent's then head of Human Resources, Barnee Price had notified him during a meeting on August 13, 2015, that a final decision had been made to change his job description and reduce his base salary by approximately 30 percent. When Navicent failed to cure under the terms of the Executive Agreement, Wanna transitioned to a full-time clinical role with Health Services on October 1, 2015. Navicent allegedly contested Wanna's entitlement to certain severance, retirement, and other benefits under the Executive Agreement. On April 15, 2016, Navicent allegedly informed Wanna that he was not going to receive any benefits under the terms of the Executive Agreement. Wanna then initiated the instant action on March 24, 2017.

In his complaint, as amended, Dr. Wanna asserted claims against Navicent and Health Services for breach of his employment agreements, fraud, negligent misrepresentation, violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), and attorney fees and expenses under OCGA § 13-6-11. In their answer, as amended, the [D]efendants asserted counterclaims for breach of contract, breach of non-compete

7

and non-solicitation covenants, breach of the duty of loyalty, breach of fiduciary duty, and attorney fees and expenses under OCGA § 13-6-11.

*Wanna I*, 357 Ga. App. at 140. The parties filed cross-motions for summary judgment. Id. at 145-146. The trial court denied Dr. Wanna's motion in its entirety and denied the Defendants' motion for summary judgment on Wanna's ERISA claim, but granted it with respect to Wanna's tort claims. Both parties then appealed and the ensuing appeals were docketed in this Court as Case Nos. A20A1378 and A20A1401 (*Wanna I*).

As relevant here, in *Wanna I*, this Court addressed Count 2 of Dr. Wanna's complaint (which alleged that Navicent breached the Executive Agreement in multiple ways). First, with respect to Wanna's allegation that Navicent was in breach by failing to pay Wanna severance after he resigned his executive position for "Good Reason," this Court affirmed the trial court's denial of the Defendants' motion for summary judgment, concluding "that a jury issue existed as to whether Wanna substantially complied with the notice provision of the Executive Agreement, and thus as to whether he satisfied the contractual requirements for resigning for 'Good Reason.'" *Wanna I*, 357 Ga. App. at 148-150 (1) (a) & (b). We also affirmed the court's denial of

8

Navicent's motion for summary judgment on Wanna's claim for OCGA § 13-6-11 attorney fees associated with this claim. Id. at 156-157 (5).

Next, Dr. Wanna alleged in Count 7 of his complaint that Navicent improperly failed to pay him his SERP benefits for 2014 and 2015, and he sought to recover those lost benefits under ERISA, 29 USC § 1132 (a) (1) (B).[1] In *Wanna I*, we reversed the denial of Navicent's motion for summary judgment, highlighting that the trial court erred "in concluding that the conflict between the SERP Summary and [the] SERP Plan created a genuine issue of material fact as to the terms for vesting of benefits; rather, the terms of the SERP Plan control as a matter of law[.]" 357 Ga. App. at 156 (4). However, we remanded to the trial court to consider Wanna's other arguments on his ERISA claim, including whether he met the requirements for accelerated vesting under the SERP Plan and whether he was entitled to pursue a claim for equitable relief under ERISA. Id.

With respect to Dr. Wanna's tort claims, we vacated the trial court's grant of Navicent's motion for summary judgment and remanded "for the court to consider

---

[1] 29 USC § 1132 (a) (1) (B) provides: "A civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan[.]"

9

whether summary judgment is appropriate on Dr. Wanna's fraud and negligent misrepresentation claims under the proper legal analysis." *Wanna I*, 357 Ga. App. at 158 (6). Specifically, we highlighted that "[t]he trial court focused solely on whether Dr. Wanna alleged the same damages for lost compensation and benefits for his fraud, negligent misrepresentation, and breach-of-contract claims instead of on whether Dr. Wanna alleged the violation of any duties independent of the duties imposed upon Navicent by the Executive Agreement."[2] Id.

The Defendants also raised counterclaims against Dr. Wanna for breach of the non-compete covenants contained in the Physician Agreement, the Executive Agreement, and the Asset Purchase Agreement. In *Wanna I*, we affirmed the trial court's denial of Wanna's motion for summary judgment, finding that genuine issues of material fact remained on whether: (1) Wanna was entitled to provide on call coverage at Coliseum under the "private practice" exception to the covenants contained in the Physician Agreement and the Asset Purchase Agreement; and (2) Health Services lacked a legitimate business interest justifying a restriction on him

---

[2] We noted that on remand, "the trial court also may consider the alternative arguments regarding summary judgment on the fraud and negligent misrepresentation claims that were raised by the parties in the proceedings below but were not addressed by the trial court[.]" *Wanna I*, 357 Ga. App. at 158 (6).

10

providing on call coverage at Coliseum. 357 Ga. App. at 159-162 (7) (a) & (b). We also affirmed the trial court's denial of summary judgment on the Defendants' counterclaims for breach of the non-compete and non-solicitation covenants in the parties' agreements, breach of the duty of loyalty, and breach of fiduciary duty, finding no merit to Wanna's contention that lost profits were an essential element of these counterclaims. Id. at 162-163 (8). And we held that the trial court properly denied Wanna's motion for summary judgment against the Defendants' counterclaim for attorney fees and expenses under OCGA § 13-6-11, finding that there remained genuine issues of material fact as to whether Wanna acted in bad faith.[3] Id. at 164-165 (9).

The opinion in *Wanna I* issued on October 15, 2020, and the remittitur was filed in the trial court on November 17, 2020. On remand, the trial court denied the Defendants' remaining summary judgment grounds.[4] As to Dr. Wanna's tort claims,

---

[3] We also affirmed the trial court's denial of Dr. Wanna's motion to compel certain discovery. *Wanna I*, 357 Ga. App. at 165-166 (10).

[4] On December 2, 2019, the Defendants filed a motion for partial summary judgment and motion to strike with respect to Dr. Wanna's Final Consolidated Complaint in which he restated and consolidated the claims listed in his complaint, as amended. The trial court did not rule on the December 2, 2019 motion prior to the appeal in *Wanna I*.

11

the trial court concluded that there remained a factual dispute as to whether Price made a misrepresentation to Dr. Wanna during the August 13, 2015 meeting before Wanna tendered his resignation letter, explaining:

> Price stated in his deposition that when he met with Dr. Wanna on August 13, 2015, the decision to reduce Dr. Wanna's salary by over 30 [percent] had not been made. Yet, Dr. Wanna testified in his deposition that Price told Dr. Wanna at the August 13, 2015 [meeting] that the discussion to reduce his salary was not something still in discussion; it was a final decision . . . . [G]iven that Dr. Wanna subsequently cited the reduction in his salary when he resigned his position, there is at least enough evidence to present a jury issue as to whether there was a false statement and whether that statement amounted to negligent and/or fraudulent misrepresentation.

The court also found that there was conflicting evidence for a jury to decide whether Martin Plevak (CEO of Health Services) negligently made a false statement to Dr. Wanna regarding whether Wanna's working at Coliseum constituted an outside activity under the terms of the 2014 Physician Agreement. Finally, with respect to Wanna's ERISA claim, the trial court found that (1) there was at least some evidence to present a jury issue as to whether Wanna's voluntary separation constitutes an involuntary separation sufficient to entitle him to accelerated vesting under the terms

of the SERP Plan; and (2) a question of fact remained as to whether the SERP Summary that the Defendants provided to Wanna listed terms that differed from those of the SERP Plan, thereby entitling him to equitable relief.

The Defendants filed a motion in limine to exclude certain evidence that they contended was not relevant to the remaining claims, and they also moved to bifurcate the trial if the trial court permitted Dr. Wanna's request for attorney fees and punitive damages to proceed. As relevant here, the Defendants sought to prevent Wanna from introducing e-mails from 2016 between Robert DiRenzo, M.D.[5] and Navicent executives containing the language "kick [Wanna's] butt out" and "[h]e's a cancer that is metastasizing." The trial court found that the e-mails were relevant and admissible to show intent as to Wanna's fraudulent misrepresentation claim and that while they were prejudicial, the court found that the e-mails "[did] not pose any risk of being unfairly prejudicial."

The trial court granted the Defendants' request to bifurcate the trial for evidence concerning (1) what amount of punitive damages would be sufficient under

---

[5] Dr. DiRenzo replaced Dr. Wanna as Chief Clinical Officer of Navicent.

OCGA § 51-12-5.1 (d) (2); (2) the amount of attorney's fees (as requested by the parties); (3) "bad faith" evidence; and (4) the conduct of the parties during litigation.[6]

The first phase of the trial commenced on March 20, 2023, and lasted over three weeks. Dr. Wanna testified that he met with Saunders (Navicent's CEO) in early August 2015 for his annual performance review, during which Saunders allegedly told him that she was restructuring the organization and "was going to demote [him]" and "[his] salary [was] going to be cut[.]" As to his salary, Wanna described that Saunders stated that she did not know the exact amount of the proposed reduction, but Price would follow up with further details. Wanna described that Price then met with him on August 13, 2015, and provided him with a document concerning details on a new executive role, and "told [him] that . . . [his] salary would be cut by 32 [percent]." The document, which included a "Proposed New Base Hourly Rate," was entered into evidence. Wanna testified that Price "did not present [him] with a proposal and offer," but rather "told [him] it was a fait accompli, it was a done deal,

_____

[6] The trial court denied the Defendants' motion to bifurcate as to Dr. Wanna's request for attorney fees to the extent that Dr. Wanna failed to produce sufficient fee documentation. The court highlighted that after the Defendants filed their request to bifurcate, but before the court issued its order, the parties exchanged fee documentation.

they've already made the decision" and "[his] pay will be cut by 32 percent." Two weeks later, on September 1, 2015, Wanna, through his counsel, sent the letter to Saunders, explaining that he was "resigning for good reason" pursuant to Section 4 (b) (1) (i) of the Executive Agreement due to the proposed salary reduction.

Saunders testified that she had grown increasingly concerned about Dr. Wanna's commitment to his executive responsibilities based on his availability and presence at critical pre-arranged executive meetings. She described that she repeatedly had to remind Wanna that if he was going to be "second in command in the organization . . . he needed to be there." Saunders eventually told Wanna that there needed to be a change either to the scope of his executive role or a renewed commitment to his executive responsibilities, and it was "about him making a choice as to what it [was] that he wanted to do[.]"

Price testified that when he met with Dr. Wanna on August 13, 2015, he intended to discuss one of several potential revised executive roles and proposed salaries for Wanna based on advice from a third party consulting group. Price stressed that the revised job description and compensation for Wanna were just "proposed" changes and there had "been no decision made relative to the salary that was going to

be offered with this particular opportunity." Price further stated that following the August 13 meeting, "it was left with Dr. Wanna to go back to Dr. Saunders and discuss . . . the potential of him assuming that role at a salary which had yet to be determined." Price maintained that (1) he did not communicate to Wanna that a final decision had been made on any potential change in role or salary; (2) he did not believe that he said anything untruthful to Wanna; and (3) he was not trying to mislead or deceive Wanna in any way and he had no reason to do so.

After Dr. Wanna finished presenting his case and again at the close of all evidence, the Defendants moved for a directed verdict on Wanna's substantive claims for breach of contract, negligent misrepresentation, fraud, ERISA, and attorney fees. The trial court denied the Defendants' motion on both occasions.

The jury found in favor of Dr. Wanna on all of his claims, including for breach of contract, tort, and ERISA. The jury further awarded Wanna punitive damages on his fraud claims, as well as attorney fees and expenses. The jury found in favor of the Defendants only with respect to their counterclaim for breach of contract, finding that Wanna breached the non-compete restriction as an executive or the employment non-

16

solicitation restriction of the Executive Agreement and awarded the Defendants $185,630.

Thereafter, in the second phase of the trial, the jury heard evidence on the amount of punitive damages and fees and expenses. The Defendants later moved for a directed verdict, arguing that Dr. Wanna failed to produce sufficient billing records by counsel or other documentary evidence to prove the amount of the attorney fees sought. The trial court denied the Defendants' motion. The jury returned a verdict awarding Wanna $2.82 million in punitive damages and $1.5 million in OCGA § 13-6-11 attorney fees and expenses. After Wanna made certain elections as to his remedies, the trial court entered a final judgment, awarding $5,096,812 to Wanna, and $185,630 to Navicent on its sole prevailing counterclaim.

The Defendants filed a notice of appeal from the trial court's entry of judgment after the jury verdict and that appeal has been docketed in this Court as Case No. A24A0909. Dr. Wanna filed a cross-appeal, which has been docketed in this Court as Case No. A24A0910.

*Case No. A24A0909*

17

1. The Defendants argue that the judgment must be vacated because the jury's verdict was inconsistent and thus void. They contend that "Wanna tried two sets of claims which relied on opposite, mutually exclusive factual premises about whether he had 'Good Reason' to resign from his executive position at Navicent when he did so." Even though Dr. Wanna presented inconsistent theories, the Defendants assert that "the jury gave Wanna exactly what he asked for, finding [the] Defendants liable on all counts pertaining to his Executive Agreement benefits[.]"

"In a civil case, a verdict that is contradictory and repugnant is void, and no valid judgment can be entered thereon. A judgment entered on such a verdict will be set aside." *Anthony v. Gator Cochran Constr.*, 288 Ga. 79, 79 (702 SE2d 139) (2010) (citation and punctuation omitted). Nevertheless, under OCGA § 9-12-4, "[v]erdicts shall have a reasonable intendment and shall receive a reasonable construction. They shall not be avoided unless from necessity." "Thus, the presumptions are in favor of the validity of verdicts, and if possible a construction will be given which will uphold them. Even if the verdict is ambiguous and susceptible of two constructions, one of which would uphold it and one of which would defeat it, that which would uphold it is to be applied." *Anthony*, 288 Ga. at 80-81 (citations and punctuation omitted);

*Rockdale Hosp. v. Evans*, 306 Ga. 847, 851 (2) (a) (834 SE2d 77) (2019) ("[T]he trial court's approval of the verdict creates a presumption of correctness which is not to be disturbed absent compelling evidence.") (citation and punctuation omitted). "The burden is upon the party attacking a verdict to show its invalidity." *Zurich American Ins. Co. of Illinois v. Bruce*, 193 Ga. App. 804, 804 (1) (388 SE2d 923) (1989) (citation and punctuation omitted).

Here, under his breach-of-contract (Count 2) and ERISA (Count 7) claims, Dr. Wanna asserted that Navicent breached the Executive Agreement and the SERP Summary by denying him his accrued severance, retirement, and related benefits. The Executive Agreement outlined that Wanna could "resign for Good Reason at any time," and clarified that a "Good Reason" included "any material reduction in [Wanna's] Salary." Similarly, the SERP Summary provided that his retirement benefits would vest among other things upon "the termination by [Wanna] of his . . . employment for good reason (e.g., a material reduction in [Wanna's] base salary, authority, duties, etc.)[.]" Regarding their inconsistent verdict claim, the Defendants argue that (with respect to his claims in Counts 2 and 7) on the one hand, Wanna asserted that he resigned *after* a final decision by Navicent had been made to reduce

19

his salary. Therefore, he was entitled to his benefits because he resigned with "Good Reason."[7]

On the other hand, the Defendants highlight that Dr. Wanna's negligent misrepresentation and tort claims were premised on a completely different theory — the assumption that "Good Reason" did not yet exist when he resigned. Under this theory, Wanna claimed that he prematurely tendered his resignation on September 1, 2015, based on Price's allegedly misleading statement that a final decision had been made to reduce Wanna's salary, even though the salary cut was still a recommendation at that point.[8]

---

[7] At trial, during opening statements, Wanna told the jury that the "evidence w[ould] show he resigned the Chief Clinical Officer and Chief Medical Officer position for good reason and he's entitled to [his] benefits." Wanna later testified about meeting with Price on August 13, 2015, where Price allegedly told him that the 32 percent reduction to his salary was not "a proposal and offer"; rather it was "a fait accompli, it was a done deal[.]" During closing arguments, Wanna also argued that his resignation for "Good Reason" entitled him to his retirement benefits under the language of the SERP Summary.

[8] In his closing argument, Wanna's counsel argued that "had [Wanna] not been lied to and misled and made to believe that it was [a] final decision to cut his pay by 32 percent, he wouldn't have resigned," and thus would not have lost his entitlement to retirement and severance benefits.

The Defendants' contention of an inconsistent verdict is misplaced. In the first instance, Dr. Wanna picked fraud as his remedy when asked by the trial court to make an election (at Navicent's request) between the breach-of-contract and fraud verdicts at the start of the second phase of the trial. See *Carnett's, Inc. v. Hammond*, 279 Ga. 125, 130 (6) (610 SE2d 529) (2005) ("A party cannot complain of a judgment, order, or ruling that his own conduct produced or aided in causing.") (citation and punctuation omitted). To the extent that the Defendants argue that the trial court erred by not questioning the jury about the alleged inconsistency between the fraud and breach-of-contract verdicts, there is no indication in the record that the Defendants ever moved the trial court to submit any questions to the jury on this issue. See *Cordial Endeavor Concessions of Atlanta, LLC v. Gebo Law, LLC*, 370 Ga. App. 528, 530-531 (2) (898 SE2d 259) (2024) ("An argument not raised in the trial court is waived and cannot be raised for the first time on appeal.") (citation and punctuation omitted).

In any event, the Defendants misconstrue the language of the Executive Agreement, which provided that "Good Reason" for Dr. Wanna's resignation "shall not exist" unless and until Wanna gave Navicent a detailed written statement for his

21

belief that "Good Reason" existed and provided Navicent with 30 days to cure the basis for such belief. On September 1, 2015, Wanna delivered to Navicent a written statement of the basis for his belief that Good Reason existed (based on Price's representation at the August 2015 meeting that Wanna's salary would be reduced by 32 percent), and gave Navicent an opportunity to cure. It was only after the expiration of the 30-day period, on October 1, 2015, after Navicent failed to cure, that Wanna's resignation became effective.

To support their allegation of inconsistent verdicts, the Defendants rely on non-binding case law from other jurisdictions. We find these cases readily distinguishable. For example, in *U. S. Fidelity & Guaranty Co. v. McKinnon*, after the jury found in favor of the plaintiff for both breach of contract and fraudulent misrepresentation with respect to an insurance contract, the Supreme Court of Alabama found that the theories of recovery were "factually inconsistent" and "self contradictory." 356 So2d 600, 607-608 (III) (Ala. 1978). Specifically, the court explained that the jury could not find "breach of an existing contract and at the same time" also find "fraud for representing that there was a contract when, in fact, there was none[.]" Id. at 608 (III). See also *Alph C. Kaufman, Inc. v. Cornerstone Indus. Corp.*, 540 SW3d 803, 815-

816 (B) (Ky. Ct. App. 2017) (finding verdicts inconsistent where breach-of-contract count was based on the existence of a non-compete agreement while fraud count premised on the non-existence of the same contract).

Contrary to the Defendants' contention, the jury's verdicts with respect to the breach–of-contract and fraud claims were not necessarily inconsistent. The jury found that Price committed fraud during the August 13, 2015 meeting when he represented to Wanna that a final decision had been made to reduce Wanna's salary by 32 percent.[9] But it was not until October 1, 2015, after Navicent did not cure Wanna's written notice, that "Good Reason" existed for Wanna's resignation. Put another way, a finding of fraud is not inconsistent with the existence of "Good Reason" under the Executive Agreement, which was dependent on whether Navicent exercised its right to cure. We therefore find no merit to the Defendants' contention that the trial court erred in accepting an inconsistent verdict.

2. The Defendants contend that the trial court erred by admitting two e-mails sent by Navicent personnel because these communications were legally irrelevant and

_____

[9] In *Wanna I*, this Court found that genuine issues of material fact remained as to whether the 32 percent reduction in Dr. Wanna's salary was a final decision or a mere proposal. 357 Ga. App. at 148-149 (1) (a).

23

highly prejudicial as they were of "no consequence" to whether Price made any false statements during the August 2015 meeting. The Defendants maintain that the e-mails, sent six months after the August 2015 meeting, "inflame[d] the jury" and resulted in the jury awarding Wanna "a damages sum almost [ten] times the amount of the contract benefits he claimed he was entitled."

"All relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules. . . . Evidence which is not relevant shall not be admissible." OCGA § 24-4-402. "[T]he term 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. "[E]vidence having a tendency to establish facts in issue is relevant and admissible, and no matter how slight the probative value, our law favors admission of relevant evidence." *City of Atlanta v. Bennett*, 322 Ga. App. 726, 728 (1) (746 SE2d 198) (2013) (citation and punctuation omitted). "Admission of evidence is a matter resting within the sound discretion of the trial court, and appellate courts will not disturb the exercise of that discretion

absent evidence of its abuse." *Arnold v. Liggins*, 368 Ga. App. 544, 545 (1) (890 SE2d 446) (2023) (citation and punctuation omitted).

The Defendants maintain that Dr. DiRenzo's e-mails are legally irrelevant because they have no bearing on what Price told Dr. Wanna in August 2015 with respect to whether a final compensation decision had been made. However, taken in a broader context, the 2016 e-mail exchange between DiRenzo and Navicent executives, including CEO Saunders, occurred during the time period when Dr. Wanna contends that the Defendants falsely reassured him that he would be paid all the executive benefits he was entitled to, even though they had no intention of paying him the benefits. This evidence is relevant to Wanna's overall claim that Price had falsely told him in August 2015 that the decision to cut his salary was a final decision in order to induce Wanna to resign and forfeit his executive benefits. See *Wilson v. State*, 315 Ga. 728, 738 (8) (883 SE2d 802) (2023) ("The standard for relevance is a liberal one, and relevant evidence is admissible even if it has only slight probative value.") (citation and punctuation omitted).

The Defendants assert that even if the e-mails "were tangentially relevant," the trial court erred by failing to acknowledge the "highly inflammatory" nature of this

evidence. Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" OCGA § 24-4-403. The Defendants highlight that Dr. Wanna repeatedly relied on the e-mails during trial. For example, during closing arguments, Wanna's counsel told the jury that DiRenzo and Saunders "wanted to kick [Wanna's] butt out." Counsel also stated:

> To refer to another human being as a metastasizing cancer is disgusting enough alone. For a medical professional, who has individuals dying in their hospital from metastasizing cancer, and that's how you're going to refer to your . . . number one cardiothoracic surgeon? I literally get chills. That is disgusting, but that's what [Wanna] was dealing with.

The Defendants maintain that Wanna's constant reference to the e-mails throughout trial was "nothing but a transparent effort to evoke prejudicial emotion by the jury directed toward Navicent[.]"

During trial, the Defendants had an opportunity to explain the content of the e-mails (as well as support their counterclaim for breach of fiduciary duty). Specifically, the Defendants alleged that Dr. Wanna began working with Coliseum's executive management as early as February 2016, while still employed by Health

Services, to promote Coliseum's cardiothoracic surgery program. In his deposition, DiRenzo explained that his e-mail

> was an emotional response and a bit unprofessional, but it was a reaction to the potential that we could lose our - - our cardiovascular - - our cardiothoracic line if indeed this was true, that there were discussions going on with Coliseum hospital . . . our competitor institution. And it was upsetting that if - - again, if it were true, that one of our employed physicians would be having those kinds of discussions.

During closing arguments, Navicent argued to the jury that "Dr. Wanna was not being loyal to his employer. He was working in secret without telling his employer, while still collecting a big paycheck, ignoring his legal duty, to help move over employees and to help build the program over at Coliseum."

Here, based on the totality of the circumstances as described above, we find that the trial court did not abuse its broad discretion in determining that the evidence was not overly prejudicial pursuant to OCGA § 24-4-403. See *Suzuki Motor of America, Inc. v. Johns*, 351 Ga. App. 186, 196 (3) (a) (830 SE2d 549) (2019) ("(e)xclusion of evidence under Rule 403 is an extraordinary remedy that should be used only sparingly to prohibit matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect") (citation and punctuation omitted).

27

3. The Defendants contend that the trial court erred in denying their motion for a directed verdict as the evidence presented at trial was legally insufficient to support Dr. Wanna's negligent misrepresentation and fraud claims. We discern no error.

> A directed verdict is authorized only where there is no conflict in the evidence, and the evidence and all reasonable deductions therefrom demand a certain verdict (OCGA § 9–11–50(a)); when the jury has rendered a verdict and a complaint on appeal is addressed to the sufficiency of the evidence, the appellate court does not weigh the evidence but only determines whether there is any evidence to support the verdict.

*Dick 'N Dale Systems, Inc. v. Danwil Intl. Trading Co.*, 199 Ga. App. 840, 841 (406 SE2d 270) (1991) (emphasis omitted).

"The elements of fraud are a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." *J. E. Black Constr. Co., Inc. v. Ferguson Enterprises, Inc.*, 284 Ga. App. 345, 347 (1) (643 SE2d 852) (2007) (citation and punctuation omitted). "The essential elements [of a negligent misrepresentation claim] are (1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and

(3) economic injury proximately resulting from such reliance." Id. at 348 (2) (citation and punctuation omitted).

With respect to the tort claims, the Defendants assert that Dr. Wanna failed to show that Price intended to induce Wanna to resign following their August 2015 meeting. This argument essentially invites us to reweigh the evidence presented at trial. "However, an appellate court can only review the evidence to determine if there is any evidence to support the verdict. This (C)ourt does not reweigh the evidence, as the finder of fact, in this case the jury, is the final arbiter of the weight of the evidence and the credibility of witnesses." *Golden Isles Cruise Lines, Inc. v. Lowie*, 350 Ga. App. 1, 10 (2) (827 SE2d 703) (2019) (citation and punctuation omitted). Here, by finding in favor of Wanna, the jury found his testimony and evidence more credible than that offered by the Defendants and we have no basis to disturb the verdict.

The Defendants also contend that Dr. Wanna failed to show that he exercised due diligence to verify the accuracy of Price's representations about his salary reduction. Specifically, they contend that Wanna resigned before he confirmed the alleged change to his salary and position with someone at Navicent with "decision-making authority," such as Saunders.

The crux of Dr. Wanna's argument with respect to his tort claims is that Navicent executives affirmatively concealed information through his meetings with them about the potential change in his position and salary with the intent to induce Wanna to resign and forfeit his benefits under the terms of the Executive Agreement. As a result, contrary to the Defendants' assertion, information about Wanna's proposed salary cut was not "a matter equally open to the observation of all parties[.]" *Rainey v. GAFVT Motors, Inc.*, 269 Ga. App. 479, 481 (1) (a) (604 SE2d 840) (2004) (citation and punctuation omitted). See also *Educap, Inc. v. Haggard*, 341 Ga. App. 684, 687 (801 SE2d 611) (2017) ("fraud cannot be the basis of an action if it appears that the party alleging the fraud had equal and ample opportunity to prevent it and yet made it possible through the failure to exercise due diligence") (citation and punctuation omitted). Here, the jury heard the evidence at trial and was authorized to credit Wanna's testimony and find in his favor on his tort claims. See *Nebo Ventures, LLC v. NovaPro Risk Solutions, L.P.*, 324 Ga. App. 836, 840 (1) (d) (752 SE2d 18) (2013) (apart from "plain and indisputable cases, questions of fraud and whether a plaintiff could have protected himself through the exercise of ordinary diligence are questions for a jury") (citation and punctuation omitted).

4. The Defendants argue that the trial court erred by failing to grant their motion for a directed verdict on the jury's award of attorney fees and expenses because Dr. Wanna failed to put forth "legally sufficient evidence" to support the amounts claimed. Wanna sought approximately $1.4 million in attorney fees and expenses. In closing arguments, the Defendants argued this amount should be reduced by 50 percent and the jury should award Wanna $747,847. The jury ultimately awarded Wanna $1.5 million in attorney fees and expenses.

"Attorney fees are recoverable under OCGA § 13-6-11 when a party has acted in bad faith, has been stubbornly litigious, or has subjected the other party to unnecessary trouble and expense." *City of Lilburn v. Astra Group, Inc.*, 286 Ga. App. 568, 570 (649 SE2d 813) (2007) (citation and punctuation omitted).

> The issue of attorney fees under OCGA § 13-6-11 is a question for the jury, and an award will be upheld if any evidence is presented to support the award. However, a plaintiff is entitled to recover attorney fees only for that portion of the fees which are allocable to the attorney's efforts to prosecute a successful claim against a defendant.

*Premier Cabinets, Inc. v. Bulat*, 261 Ga. App. 578, 582 (5) (583 SE2d 235) (2003).

Dr. Wanna had the burden of proof on the issue of attorney fees, and he was required to segregate out the hours that were recoverable from those hours that were unrecoverable. *Premier Cabinets, Inc.*, 261 Ga. App. at 582 (5). Wanna sought to recover fees for his lead counsel, Anthony Cochran, as well as several other lawyers that worked on his case, including Franklin Gaddy (local counsel in Macon) and Anna Bacon-Tinsley (business attorney). Wanna submitted lengthy billing statements for each of the attorneys. During the second phase of the trial, Cochran testified and explained that approximately 75 percent of his total fees were allocable to pursuing successful claims, including those based on the Executive Agreement and the Physician Agreement, as well as for fraud, negligent misrepresentation, and with respect to retirement benefits. Cochran noted that he specifically excluded time expended on dismissed claims, counterclaims, appellate costs, as well as time spent on calculating the total amount of fees and expenses. He described that he calculated this allocation by creating a spreadsheet wherein he coded every entry in his billing statement as either recoverable or disallowed. Based on his calculations, Cochran testified that his fees and expenses for representing Wanna totaled $731,518 and

$566,205, respectively (incurred with two different firms), which, when reduced by 25 percent, amounted to $548,638 and $424,654.

The Defendants counter that Dr. Wanna did not admit the spreadsheet into evidence during the second phase of the trial. Although the Defendants had an opportunity to cross-examine Cochran about his calculations and methodology, they were not offered an opportunity to inspect the spreadsheet until trial. In fact, Cochran stated that he was still working on the spreadsheet the night before trial.

Cochran also explained that he applied the same calculations that he used on his own records to Bacon-Tinsley's fees and expenses. However, Cochran admitted that he did not review Bacon-Tinsley's billing records and he simply assumed that the breakdown of the recoverable versus unrecoverable fees for her billing statements also was 75/25 because they worked together on the case. And Bacon-Tinsley testified that her statements also included unrecoverable fees related to dismissed claims, counterclaims, prior appeals, and pre-suit activities. See *Emerson v. Brookmere Homeowners Assn., Inc.*, 311 Ga. App. 371, 372 (715 SE2d 775) (2011) (under OCGA § 13-6-11, plaintiff cannot recover expenses of defending against a counterclaim).

33

Although Dr. Wanna submitted billing statements from his lawyers that delegated various fees to different tasks performed, they were not of "sufficient particularity to permit the [factfinder] to distinguish between time and expenses attributable to the successful claims and time and expenses attributable to the pursuit of the unsuccessful claims and the defense of the counterclaims." *Birch Property Partners, LLC v. Simpson*, 364 Ga. App. 315, 330 (6) (c) (874 SE2d 814) (2022) (citation and punctuation omitted). The jury did not have access to Cochran's spreadsheet and thus could not view first hand how Cochran allocated the fees and expenses in that document or confirm his calculations. Additionally, Cochran did not undertake the same analysis of the other lawyers' billing statements. Therefore, "under the state of the evidence in the present case, the [factfinder] would have been forced into a posture of pure speculation as to which fees were attributable solely to prosecuting the successful claims." Id. (citation and punctuation omitted).

The award of attorney fees in this case is "contrary to the law" and simply "cannot be upheld as authorized pursuant to OCGA § 13-6-11." *Premier Cabinets, Inc.*, 261 Ga. App. at 583 (5). Therefore, we reverse the trial court's award of attorney fees to Dr. Wanna and remand to the trial court for an evidentiary hearing to allow

34

Wanna to establish the amount of attorney fees that was attributable to his prevailing claims with respect to each attorney. *Terrell v. Pippart*, 314 Ga. App. 483, 485 (2) (724 SE2d 802) (2012); *Premier Cabinets, Inc.*, 261 Ga. App. at 583 (5); *David C. Joel, Attorney at Law, P.C. v. Chastain*, 254 Ga. App. 592, 597-598 (4) (562 SE2d 746) (2002).

*Case No. A24A0910*

5. In his cross-appeal, Dr. Wanna argues that the trial court erroneously (1) overruled his objections to the admission of certain defense exhibits, which contained summaries of surgeries performed at Coliseum; (2) denied his motion for a directed verdict on the Defendants' lost profits claim allegedly caused by the breach of non-competition covenants; (3) sustained the Defendants' objection to Wanna's questioning of Navicent's CFO about Navicent's 2023 financials even though the Defendants questioned the CFO on direct examination about the same topic to argue against punitive damages; and (4) granted the Defendants' motion in limine regarding statements made by Navicent's CEO to Dr. Wanna and other executives at an executive training session.

As Dr. Wanna concedes in his brief, these enumerations of error "become relevant *only if* this [C]ourt orders a new trial[.]" As relevant here, the jury found that Dr. Wanna did not breach the non-competition covenants in the Physician Agreement, and therefore, did not award any lost profits to the Defendants on this counterclaim.[10] Additionally, Dr. Wanna prevailed on all of his substantive claims at trial, including for fraud and negligent misrepresentation. As explained in Divisions 1 through 3 of Case No. A24A0909 above, we have no reason to disturb the judgment with respect to these claims, and thus, we do not address these enumerations of error in Wanna's cross-appeal. See *Clayton County Civil Service Bd. v. Hill*, 355 Ga. App. 348, 351 (844 SE2d 220) (2020) ("To have the right of appeal, the party must be aggrieved by the judgment complained of. Put another way, a party not aggrieved by a decision has no standing to appeal."); *Bibbins v. State*, 280 Ga. 283, 284-285 (627 SE2d 29) (2006) ("Georgia appellate courts are not authorized to render advisory opinions as to potential error.").

---

[10] The jury found in the Defendants' favor on only one of its counterclaims: that Dr. Wanna breached the non-solicitation covenant in the Executive Agreement and awarded the Defendants $185,630 in damages. Dr. Wanna is not appealing this award.

6. Dr. Wanna asserts that the trial court erred in granting the Defendants' motion for a protective order and awarding attorney fees against him.

> A trial court has broad discretion to control discovery, including the imposition of sanctions, and this (C)ourt will not reverse a trial court's decision on discovery matters absent a clear abuse of discretion. This is because trial judges, through their direct involvement with the case, the parties, and the attorneys, and their familiarity with the actions of the parties in the conduct of discovery in similar cases that are properly brought to their attention, are in the best position to evaluate the parties' conduct and to determine the appropriate level of sanctions.

*Dentistry for Children of Ga. v. Foster*, 362 Ga. App. 217, 218 (2) (867 SE2d 617) (2022) (citations and punctuation omitted).

As relevant here, on August 4, 2022, Dr. Wanna filed a OCGA § 9-11-30 (b) (6) ("Rule 30 (b) (6)") deposition notice and OCGA § 24-13-27 notice to produce, seeking to have a corporate representative from Navicent appear at a deposition on September 8, 2022, to testify on a range of topics and produce certain related documents. In response, Navicent filed an expedited motion seeking a protective order to quash the deposition notice and notice to produce. Navicent highlighted that discovery had closed more than three years earlier in July 2019 and trial was scheduled

37

(at that point) for November 2022. Navicent alleged that Wanna already had taken at least one prior Rule 30 (b) (6) deposition as well as deposed numerous other Navicent witnesses on many of the same topics included in the current notice. Navicent maintained that Wanna's notice was not a "trial preservation" deposition; rather it was an improper attempt to circumvent the close of discovery. Navicent also sought attorney fees for having to seek a protective order.

Following a hearing, the trial court granted Navicent's motion for a protective order and quashed Dr. Wanna's notice of deposition and notice to produce. At the hearing, Wanna's counsel stated that Navicent would most likely identify Ken Banks (corporate counsel) as its Rule 30 (b) (6) representative, and the court highlighted in its order that Wanna already had taken Banks's deposition during the discovery period. There also was no indication that Wanna would be unable to subpoena Banks or that Banks would otherwise be unavailable to testify at trial. The court was unpersuaded by Wanna's attempt to frame the request as a trial deposition, explaining that Wanna essentially was attempting to depose an unfriendly witness on the eve of trial, long after the discovery period had expired. The court acknowledged that allowing Wanna to take a Rule 30 (b) (6) deposition, which could then be introduced

at trial, "would streamline the presentation of evidence and perhaps shorten the trial[.]" However, "[Wanna] already had an opportunity to streamline the presentation of evidence by conducting depositions during the discovery period." The court therefore found that Wanna's opposition to Navicent's protective order was not substantially justified. The court reserved the issue of attorney fees and later awarded the Defendants $16,044 in attorney fees.[11]

> OCGA § 9-11-26 (c) states in relevant part as follows:
>
> Upon motion by a party or by the person from whom discovery is sought and for good cause shown, . . . the court in which the action is pending . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.] . . . Paragraph (4) of subsection (a) of Code Section 9-11-37 applies to the award of expenses incurred in relation to the motion.

With respect to the award of expenses in the event the protective order is granted, OCGA § 9-11-37 (a) (4) (A) provides as follows:

> If the motion is granted, the court *shall*, after opportunity for hearing, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the

---

[11] The parties represent that the final fee award is not part of the record on appeal because Dr. Wanna's counsel personally paid this sum.

moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.

(Emphasis supplied.)

Dr. Wanna asserts that the trial court erred in awarding attorney fees because there is no Georgia case law directly on point on the issue of whether a Rule 30 (b) (6) deposition can be utilized as a trial preservation deposition, and thus his opposition to the Defendants' motion for a protective order was substantially justified. In support, Wanna relies on case law analyzing the award of attorney fees under OCGA § 9-15-14 (b), which states that a court may award attorney fees if it "finds that an attorney or party brought . . . an action, or any part thereof, that lacked substantial justification[.]" By contrast, as noted above, an award of fees under OCGA § 9-11-37 (a) (4) (A) mandates that a court "shall" award fees "unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust."

In this case, the record shows on September 11, 2018 (during the discovery period), Dr. Wanna filed a request to take an additional Rule 30 (b) (6) discovery

40

deposition of Navicent. The trial court implicitly denied the request, stating that the only documents relevant for trial were those already disclosed during the discovery period. As described above, the court later found no merit to Wanna's attempt to recast his request for a Rule 30 (b) (6) discovery deposition as a trial preservation deposition, which was well within its discretion. See *Rogers v. Schuman-Mann Supply Co.*, 197 Ga. App. 59, 60-61 (3) (397 SE2d 463) (1990) (award of reasonable attorney fees incurred by defendant in seeking protective orders to prevent unduly burdensome discovery requests, including production of 40 years' worth of public records and a second deposition of a city employee, was not abuse of discretion; discovery requests were either unreasonable or involved work product) (physical precedent only).

Based on the foregoing, we find no abuse of discretion in the trial court's finding that Dr. Wanna's opposition to the Defendants' motion for a protective order was not substantially justified nor in its award of attorney fees. See *Kemira v. Amory*, 210 Ga. App. 48, 52 (1) (435 SE2d 236) (1993) ("Since there was some evidence upon

which the trial court could base its ruling, we find no abuse of discretion in [the sanction the court imposed].").

*Judgment affirmed in Case No. A24A0910. Judgment affirmed in part and reversed in part, and case remanded in Case No. A24A0909. Barnes, P. J., and Pipkin, J., concur.*